UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARK ZAMBON, KRISTIN ZAMBON,         )
JAMES AMOS, DESTY BOATRIGHT,          )
individually and on behalf of the estate of   )
MICHAEL BOATRIGHT, deceased,          )
DANIEL BROWN, KRISTINA BROWN,       )
SAMUEL BROWN, SKYLER COLEMAN,      )
CHRISTOPHER CRAIG, DOMINIC           )
DAVILA, LARRY DRAUGHN, KAYTLIN      )
DRAUGHN, SARAH PETERS-DUARTE,        )
individually and on behalf of the estate of   )
CURTIS DUARTE, deceased, JOSEPH       )
DUARTE, MITCHELL EHLKE,               )
DOMINIC FERNANDEZ, HEIDI DEOTIS,     )
individually and on behalf of N. F., a minor,  )
E. F., a minor, M. F., a minor, RAMIRO     )
FLORES, KENDRA GARZA, JASON          )
GIBSON, KARA GIBSON, individually      )
and on behalf of Q. G., a minor, RUBEN     )
GOMEZ, LINDSEY GOMEZ, individually    )
and on behalf of D. G., a minor, DANIEL    )
GUBLER, JASON HALLETT, RACHEL        )
HALLET, ADAM HARTSWICK,              )
BRADLEY IVANCHAN, JACOB JANES,       )
HYESUK JERAK, individually and on       )
behalf of the estate of IVICA JERAK,      )
deceased,  BRIAN JERGENS, TERENCE      )
JONES, JOSEPH KAPACZIEWSKI,           )
JARED KRIGER, JESSICA KRIGER,         )
JUSTIN LANE, CRYSTAL LANE,            )
DENNIS LEONARD, WESLEY LEON-         )
BARRIENTOS, JACOB LERNER, JOSE        )
MARTINEZ-HERNANDEZ, LISETH           )
MARTINEZ-ARELLANO, JORDAN            )
MAYNARD, KELLEY MAYNARD,             )
SHEENA MCCLOUD, individually and on    )
behalf of the estate of CHRISTOPHER      )
MCCLOUD, deceased, A. M., a minor, and   )
L. M., a minor,  BRIAN MEYER,           )
JEDIDIAH MORGAN, ANNA MORGAN,        )
JUSTIN PATTERSON, ELISA               )

CASE NO. 1:18-cv-2065
_____

**JURY TRIAL DEMANDED**

PATTERSON, individually and on behalf of )
A. P., a minor, E. P., a minor, and M. P., a )
minor, ALEXIS PATTERSON, TREVOR )
PHILLIPS, individually and on behalf of T. )
W., a minor, BRANDON RUMBAUGH, )
JOSHUA SAMS, SAMUEL SHOCKLEY, )
MIGUEL SIMENTAL, ARIADNA )
SIMENTAL, individually and on behalf of )
M. S., a minor, A. S., a minor, and M. A. S., )
a minor, DANIEL STAMPER, JOHN )
STEINBAUGH, KYLE STEWART, )
CAMERON STUART, KATY STUART, )
MATTHEW SULLIVAN, CARLOS )
TORRES, JULIAN TORRES, ASHLEY )
TORRES, individually, and on behalf of J. )
T., a minor, and A. T., a minor, )
CHRISTOPHER VAN ETTEN, JESSE )
WATSON, JOSHUA WELLS, individually, )
and on behalf of K. W., a minor, T. W., a )
minor, CAMERON WEST, MADISON )
WEST, individually and on behalf of E. W., )
a minor, R. W., a minor,  BRIAN )
WILLIAMS, JACK WILLIAMS, ASHLEE )
WILLIAMS, individually and on behalf of )
K.W., a minor, BRETT WOLF, JACK )
ZIMMERMAN, MEGAN ZIMMERMAN, )
individually and on behalf of  B. Z., a minor, )
and W. Z., a minor, )
                                                              )
                        *Plaintiffs* )
                                                              )
v. )
                                                              )
ISLAMIC REPUBLIC OF IRAN, )
Ministry of Foreign Affairs )
Khomeini Ave. )
United Nations St. )
Tehran, Iran )
                                                              )
                        *Defendant.* )
_____ )

**PLAINTIFFS' ORIGINAL COMPLAINT**

2

## I.      SUMMARY

1.      Plaintiffs and, where applicable, their families bring this civil action pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A (hereinafter "FSIA") for personal injuries and related torts.  Plaintiffs were injured by the Islamic Republic of Iran ("Iran") and/or its agents in Iraq and/or Afghanistan from approximately 2003 to 2015.

2.      Iran's agents included the U.S.-designated Foreign Terrorist Organization (as defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")) Hezbollah; the Islamic Revolutionary Guard Corps ("IRGC"), whose subdivision known as the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF") is a Specially Designated Global Terrorist; and other terrorist agents that included a litany of Iraqi Shi'a terror groups referred to herein collectively as "Special Groups."

3.      On January 19, 1984, the United States officially designated Iran as a State Sponsor of Terrorism, pursuant to § 6(j) of the Export Administration Act, § 40 of the Arms Export Control Act, and § 620A of the Foreign Assistance Act.

4.      The United States designated Hezbollah as a Specially Designated Terrorist on January 25, 1995.  Hezbollah was designated a Foreign Terrorist Organization by the United States on October 8, 1997, and it has retained that designation since that time.  Additionally, Hezbollah was designated a Specially Designated Global Terrorist by the United States on October 31, 2001, pursuant to E.O. 13224.

## II.      JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter and over Defendant pursuant to 28 U.S.C. §§ 1330(a), 1330(b), 1331, 1332(a)(2) and 1605A(a)(1), which create subject matter

jurisdiction and personal jurisdiction for civil actions for personal injuries against State Sponsors of Terrorism and their officials, employees, and agents.

6.      28 U.S.C. § 1605A(c) provides a federal private right of action against a foreign state that is or was a State Sponsor of Terrorism, and also against any official, employee or agent of that foreign state while acting within the scope of his or her office, employment or agency, for personal injury and related torts.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(f).

### III.      THE PARTIES

**PLAINTIFFS**

8.      Plaintiff Mark Zambon is a citizen of the United States and domiciled in the State of California.  On or about April 2010 and January 2011, Plaintiff was injured in Afghanistan when he was struck by an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Marine Corp.  As a result of this attack, Plaintiff sustained severe personal injuries, including but not limited to loss of both legs above the knee, loss of digital joints in the left hand, damaged hearing and other severe injuries.

9.      Plaintiff Kristin Zambon is a citizen of the United States and domiciled in the State of California.  She is the wife of Plaintiff Mark Zambon.  As a result of the attack and the injuries sustained by her husband, as described above, Plaintiff Kristin Zambon has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

10.     Plaintiff James Amos is a citizen of the United States and domiciled in the State of Kansas.  On or about August 10, 2006, and again on June 6, 2011, Plaintiff Amos was injured in Iraq and then again in Afghanistan and when he was struck by an Iranian-made and/or -supplied

terrorism-related explosive device while serving in the U.S. Marine Corps.  As a result of these attacks, Plaintiff Amos sustained severe personal injuries, including but not limited to amputations of both legs above the knees, broken pelvis, and facial injuries from the explosion.

11.     Michael Boatright was a citizen of the United States and was domiciled in the State of Texas.  On or about December 4, 2004, Michael Boatright was killed in Iraq when he was struck by an Iranian-made and/or -supplied terrorism-related while serving in the U.S. Army.

12.     Plaintiff Desty Boatright is a citizen of the United States and domiciled in the State of Texas.  She was the wife of Michael Boatright and is the legal representative for the Estate of Michael Boatright.  As a result of the attack, and the death of Michael Boatright, Plaintiff Desty Boatright has experienced loss of consortium, loss of companionship, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

13.     Plaintiff Daniel Brown is a citizen of the United States and domiciled in the State of Texas.  On or about March 9, 2012, Plaintiff Daniel Brown was injured in Afghanistan when he was hit by an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Navy as a Special Operations Independent Duty Corpsman.  As a result of this attack, Plaintiff Daniel Brown has sustained severe personal injuries, including but not limited to neurological issues causing difficulty breathing and decrease in cognitive functions.

14.     Plaintiff Kristina Brown is a citizen of the United States and domiciled in the State of Texas.  She is the wife of Daniel Brown.  As a result of the attack and the injuries Daniel Brown has suffered, as described above, Plaintiff Kristina Brown has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

15.     Plaintiff Samuel Brown is a citizen of the United States and domiciled in the State of Texas.  On or about September 4, 2008, Plaintiff Samuel Brown was injured in Afghanistan

when his Humvee rolled over an Iranian-made and/or -supplied terrorism-related explosive device while he was serving in the U.S. Army as a Platoon Leader.  Due to the impact of the attack, Plaintiff Samuel Brown was set on fire, which caused severe personal injuries, including but not limited to severe burns to his face and arms, and amputation of his left index finger.

16.     Plaintiff Skyler Coleman is a citizen of the United States and domiciled in the State of Ohio.  On or about May 30, 2011, Plaintiff Coleman was injured in Afghanistan when he was struck by an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Marine Corps.  As a result of this attack, Plaintiff Coleman suffered severe personal injuries, including but not limited to amputation of his leg.

17.     Plaintiff Christopher Craig is a citizen of the United States and domiciled in the State of North Carolina.  On or about August 25, 2005, Plaintiff Craig was injured in Iraq when his armored vehicle was hit by an Iranian-made and/or -supplied terrorism-related explosive device while he was serving in the U.S. Army.  This attack killed four of the eight passengers in the armored vehicle.  As a result of the attack, Plaintiff Craig suffered severe personal injuries, including but not limited to a broken hip, broken left ankle, concussion, burns to his body, and abrasions on both of his eyes which caused temporary blindness.

18.     Plaintiff Dominic Davila is a citizen of the United States and domiciled in the State of Utah.  On or about July 23, 2009, Plaintiff Davila was injured in Afghanistan when his Humvee was struck by an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Marine Corps.  Due to the impact of the explosive device, Plaintiff Davila was ejected from the vehicle and suffered severe personal injuries, including but not limited to severe burns to the face, ankle fracture, and amputation of the left leg below the knee.

19.     Plaintiff Larry Draughn is a citizen of the United States and domiciled in the State of Ohio.  On or about May 31, 2009, Plaintiff Larry Draughn was injured in Afghanistan when he stepped on an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Marine Corps.  As a result of this attack, Plaintiff Larry Draughn was blown into the air, immediately losing a limb, and sustained other severe personal injuries, including but not limited to loss of right leg below the knee, loss of left leg above the knee, loss of fingers, permanent damage to his hand functions, and mild Traumatic Brain Injury ("TBI").

20.     Plaintiff Kaytlin Draughn is a citizen of the United States and is domiciled in the State of Ohio.  She is the wife of Plaintiff Larry Draughn.  As a result of the attack and the injuries her husband suffered, as described above, Plaintiff Kaytlin Draughn has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

21.     Curtis Duarte was a citizen of the United States and was domiciled in the State of Arizona.  On or about August 1, 2012, Curtis Duarte was killed in Afghanistan when he was struck by an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Marine Corps.

22.     Plaintiff Sarah Peters-Duarte is a citizen of the United States and is domiciled in the State of Arizona.  She was the wife of Curtis Duarte and is the legal representative for the Estate of Curtis Duarte.  As a result of the attack, and the death of her husband, as described above, Plaintiff Peters-Duarte has experienced loss of consortium, loss of companionship, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

23.     Plaintiff Joseph Duarte is a citizen of the United States and is domiciled in the State of Arizona.  He was the father of Curtis Duarte.  As a result of the attack, and the death of his son,

as described above, Plaintiff Joseph Duarte has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

24.     Plaintiff Mitchell Ehlke is a citizen of the United States and domiciled in the State of Idaho.  On or about May 8, 2005, Plaintiff Ehlke was injured in Iraq when his vehicle rolled over an Iranian-made and/or -supplied terrorism-related explosive device while he was serving in the U.S. Marine Corps.  As a result of this attack, Plaintiff Ehlke suffered severe personal injuries, including but not limited to shrapnel injuries along the right-side of his body from his right forearm to the heel and arch of his right foot, concussion, ringing in the ears, and severe back pain.

25.     Plaintiff Dominic Fernandez is a citizen of the United States and domiciled in the State of Minnesota.  On or about July 22, 2010, Plaintiff Dominic Fernandez was injured in Afghanistan when he was struck by an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Marine Corps.  As a result of this attack, Plaintiff Dominic Fernandez suffered severe personal injuries, including but not limited to amputation of his right leg above the knee, broken neck, PTSD with major depressive disorder, TBI, right ulnar neuropathy, and other injuries.

26.     Plaintiff Heidi DeOtis is a citizen of the United States and domiciled in the State of Minnesota.  She is the wife of Plaintiff Dominic Fernandez.  As a result of the attack and the injuries her husband suffered, as described above, Plaintiff DeOtis has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

27.     Plaintiffs N. F., a minor, E. F., a minor, and M. F., a minor, all represented by their legal guardian, Heidi DeOtis, are citizens of the United States and is domiciled in the State of Minnesota.  They are the children of Plaintiff Dominic Fernandez.  As a result of the attack and

8

the injuries sustained by their father, as described above, Plaintiffs N. F., E. F., and M. F., have experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

28.     Plaintiff Ramiro Flores is a citizen of the United States and domiciled in the State of Idaho.  On or about September of 2004, Plaintiff Flores was injured in Afghanistan when he was struck by an Iranian-made and/or -supplied terrorism-related explosive device that was in a suicide vehicle while he was serving in the U.S. Army.  Plaintiff was struck in the face by shrapnel. As a result of this attack, Plaintiff Flores suffered severe personal injuries, including but not limited to facial injuries, severe headaches, and post-traumatic stress disorder ("PTSD").

29.     Plaintiff Kendra Garza is a citizen of the United States and domiciled in the State of Georgia.  On or about May 11, 2010, Plaintiff Garza was injured in Afghanistan when she was hit by an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Army.  Due to the impact of the attack, Plaintiff Garza sustained severe personal injuries, including but not limited to amputation of the left leg above the knee.

30.     Plaintiff Jason Gibson is a citizen of the United States and domiciled in the State of Ohio.  On or about May 30, 2012, Plaintiff was injured in Afghanistan when he was struck by an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Army. As a result of this attack, Plaintiff Jason Gibson suffered severe personal injuries, including but not limited to bilateral hip disarticulation (amputated at both hips), amputation of right index finger, and injuries to his right arm.

31.     Plaintiff Kara Gibson is a citizen of the United States and domiciled in the State of Ohio.  She is the wife of Plaintiff Jason Gibson.  As a result of the attack and the injuries her

husband suffered, as described above, Plaintiff Kara Gibson has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

32.     Plaintiff Q. G., a minor represented by his legal guardian, Kara Gibson, is a citizen of the United States and is domiciled in the State of Ohio.  He is the son of Plaintiff Jason Gibson. As a result of the attack and the injuries sustained by his father, as described above, Plaintiff Q. G. has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

33.     Plaintiff Ruben Gomez is a citizen of the United States and domiciled in the State of New Jersey.  On or about February 16, 2011, Plaintiff was injured in Afghanistan when he was struck with an Iranian-made and/or -supplied terrorism-related explosive device while serving as a medic in the U.S. Army.  The attack hit his left leg and launched him approximately 15 feet in the air.  Due to the impact of this attack, Plaintiff sustained severe personal injuries, including but not limited to amputation of his lower left leg, amputation of three fingers on his left hand, severe nerve, muscular, and bone damage, and fracture of his neck.

34.     Plaintiff Lindsey Gomez is a citizen of the United State and domiciled in the State of New Jersey.  She is the wife of Plaintiff Ruben Gomez.  As a result of the attack and injuries her husband sustained, as described above, Plaintiff Lindsey Gomez has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

35.     Plaintiff D. G., a minor represented by his legal guardian, Lindsey Gomez, is a citizen of the United States and is domiciled in the State of New Jersey.  He is the son of the Plaintiff Ruben Gomez.  As a result of the attack and the injuries sustained by his father, as

described above, Plaintiff D. G. has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

36.     Plaintiff Daniel Gubler is a citizen of the United States and domiciled in the State of Idaho.  On or about November 16, 2005, Plaintiff Gubler was injured in Iraq when he was hit by an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Army.   Due to the impact of this attack, Plaintiff Gubler sustained severe personal injuries, including but not limited to loss of upper left arm, loss of vision in his right eye, TBI, fractured skull, and shrapnel wounds in his legs, face, and arm.

37.     Plaintiff Jason Hallett is a citizen of the United States and domiciled in the State of Colorado.  On or about October 23, 2010, Plaintiff Jason Hallett was injured in Afghanistan when he was struck by an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Marine Corps.  As a result of this attack, Plaintiff Jason Hallett sustained severe personal injuries, including but not limited to amputation of both legs above the knees, and losing multiple fingers on his left hand.

38.     Plaintiff Rachel Hallett is a citizen of the United States and domiciled in the State of Colorado.  She is the wife of Plaintiff Jason Hallett.  As a result of the attack and the injuries sustained by her husband, as described above, Plaintiff Rachel Hallett has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

39.     Plaintiff Adam Hartswick is a citizen of the United States and domiciled in the State of Pennsylvania.  On or about May 14, 2013, Plaintiff Hartswick was injured in Afghanistan when he was struck by an Iranian-made and/or -supplied terrorism-related explosive device during a rescue attempt while serving for the U.S. Army as a combat medic.  As a result of this attack,

Plaintiff Adam Hartswick sustained severe personal injuries, including but not limited to amputation of both legs above the knee, TBI, bilateral perforated eardrums, broken hip, amputation of his right index finger, partial amputation of his right thumb, and muscle avulsion of right forearm.

40.     Plaintiff Bradley Ivanchan is a citizen of the United States and domiciled in the State of California.  On or about June 12, 2012, Plaintiff Ivanchan was injured in Afghanistan when he stepped on an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Marine Corps.  Due to the impact of this attack, Plaintiff Ivanchan sustained severe personal injuries, including but not limited to bilateral amputation of both legs, TBI, damage to left hand, and other severe injuries.

41.     Plaintiff Jacob Janes is a citizen of the United States and domiciled in the State of Wisconsin.  On or about April 3, 2009, Plaintiff Janes was injured in Afghanistan when he was hit by an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Marine Corps.  As a result of this attack, Plaintiff Janes suffered severe personal injuries, including but not limited to the loss of both his legs below the knee, severe nerve damage, TBI, and PTSD.

42.     Ivica Jerak was a citizen of the United States and was domiciled in the State of North Carolina.  On or about August 26, 2005, Plaintiff Ivica Jerak was killed in Iraq when he was struck by an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Army.

43.     Plaintiff Hyesuk Jerak is a citizen of the United States and domiciled in the State of North Carolina.  She was the wife of Ivica Jerak and is the legal representative for the Estate of Ivica Jerak.  As a result of the attack, and the death of Ivica Jerak, Plaintiff Hyesuk Jerak has

experienced loss of consortium, loss of companionship, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

44.     Plaintiff Brian Jergens is a citizen of the United States and domiciled in the State of California.  On or about August 7, 2011, Plaintiff Jergens was injured in Afghanistan when his Humvee truck struck an Iranian-made and/or -supplied terrorism-related explosive device while he was serving in the U.S. Army.  As a result of this attack, Plaintiff Jergens sustained severe personal injuries, including but not limited to losing both legs below the knee, removal of his spleen, severe abdominal injuries, cracked vertebrae, broken arm, and loss of his ring finger on his left hand.

45.     Plaintiff Terence Jones is a citizen of the United States and domiciled in the State of Texas.  On or about February 7, 2012, Plaintiff Jones was injured in Afghanistan when he stepped on an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Army.  As a result of this attack, Plaintiff Jones sustained severe personal injuries, including but not limited to loss of both legs, and damage to his left arm causing partial use.

46.     Plaintiff Joseph Kapacziewski is a citizen of the United States and domiciled in the State of Texas.  On or about October 3, 2005, Plaintiff Kapacziewski was injured in Iraq when he was struck by an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Army.  As a result of this attack, Plaintiff Kapacziewski suffered severe personal injuries, including but not limited to amputation of leg below the knee, shattered right side of the body and injuries to his arm and hip.

47.     Plaintiff Jared Kriger is a citizen of the United States and domiciled in the State of Kentucky.  On or about April 6, 2003, Plaintiff Jared Kriger was injured in Iraq when he was struck by Iranian-made and/or -supplied terrorism-related explosive devices and shot while serving in the

U.S. Army.  On or about October 10, 2005, Plaintiff was again injured in Iraq when his vehicle ran over an explosive device while serving in the U.S. Army.  As a result of these attacks, Plaintiff Jared Kriger suffered severe personal injuries, including but not limited to gunshot wounds to his lower right leg, shrapnel in his upper thigh, mild concussion, and severe back issues.

48.     Plaintiff Jessica Kriger is a citizen of the United States and is domiciled in the State of Kentucky.  She is the wife of Plaintiff Jared Kriger.  As a result of the attack and the injuries her husband suffered, as described above, Plaintiff Jessica Kriger has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

49.     Plaintiff Justin Lane is a citizen of the United States and domiciled in the State of Texas.  On or about July 2, 2011, Plaintiff Justin Lane was injured in Afghanistan when he was struck by an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Army.  This attack left him in a coma for a month and a half.  Due to the impact of the attack, Plaintiff Justin Lane suffered severe personal injuries, including but not limited to loss of both legs, broken right arm, loss of left middle finger, broken femur, and broken pelvis.

50.     Plaintiff Crystal Lane is a citizen of the United States and domiciled in the State of Texas.  She is the wife of Plaintiff Justin Lane.  As a result of the attack and the injuries sustained by her husband, as described above, Plaintiff Crystal Lane has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries

51.     Plaintiff Dennis Leonard is a citizen of the United States and domiciled in the State of Pennsylvania.  On or about January 13, 2007, Plaintiff Leonard was injured in Iraq when he was struck by Iranian-made and/or -supplied terrorism-related explosive devices while he was serving in the U.S. Army.  As a result of this attack, Plaintiff Leonard suffered severe personal injuries,

including but not limited to bilateral amputations of his legs above the knee, and lower lumbar puncture wound.

52.     Plaintiff Wesley Leon-Barrientos is a citizen of the United States and domiciled in the State of California.  On or about December 20, 2007, Plaintiff Leon-Barrientos was injured in Iraq when his vehicle rolled over an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Army.  Due to the impact of the attack, Plaintiff Leon-Barrientos sustained severe personal injuries, including but not limited to loss of his left leg, loss of his right foot, calf injuries, and broken jaw.

53.     Plaintiff Jacob Lerner is a citizen of the United States and domiciled in the State of Colorado.  On or about September 11, 2008, Plaintiff Lerner was injured in Afghanistan when he stepped on an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Army.  As a result of this attack, Plaintiff Lerner suffered severe personal injuries, including but not limited to amputation of his left leg below the knee.

54.     Plaintiff Jose Martinez-Hernandez is a citizen of the United States and domiciled in the State of California.  On or about March 3, 2012, Plaintiff Martinez-Hernandez was injured in Afghanistan when he stepped on an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Army.  Due to the impact of this attack, Plaintiff Martinez-Hernandez suffered severe personal injuries, including but not limited to losing both legs, loss of his right arm, and amputation of his left hand.

55.     Plaintiff Liseth Martinez-Arellano is a citizen of the United States and domiciled in the State of California.  She is the wife of Plaintiff Jose Martinez-Hernandez.  As a result of the attack and the injuries sustained by her husband, as described above, Plaintiff Liseth Martinez-

Arellano has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

56.     Plaintiff Jordan Maynard is a citizen of the United States and domiciled in the State of Arizona.  On or about March 23, 2011, Plaintiff Jordan Maynard was injured in Afghanistan stepped on an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Marine Corps.  As a result of this attack, Plaintiff suffered severe personal injuries, including but not limited to amputation of both legs above the knee, and injuring his left elbow.

57.     Plaintiff Kelley Maynard is a citizen of the United States and domiciled in the State of Arizona.  She is the wife of Plaintiff Jordan Maynard.  As a result of the attack and the injuries sustained by her husband, as described above, Plaintiff Kelley Maynard has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

58.     Christopher McCloud was a citizen of the United States and was domiciled in the State of Texas.  On or about September 14, 2007, Christopher McCloud's convoy ran over an Iranian-made and/or -supplied terrorism-related explosive device while he was serving in the U.S. Army in Iraq.  Christopher McCloud was ejected from the driver's seat and killed from this attack.

59.     Plaintiff Sheena McCloud is a citizen of the United States and is domiciled in the State of Texas.  She was the wife of Christopher McCloud and is the legal representative for the Estate of Christopher McCloud.  As a result of the attack, and the death of Christopher McCloud, Plaintiff Sheena McCloud has experienced loss of consortium, loss of companionship, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

60.     Plaintiffs A. M., a minor, and L. M., a minor, both represented by their legal guardian, Sheena McCloud, are citizens of the United States and domiciled in the State of Texas.

They are the children of Christopher McCloud.  As a result of the attack, and the death of their father, as described above, A. M. and L. M. have experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

61.     Plaintiff Brian Meyer is a citizen of the United States and domiciled in the State of California.  On or about March 14, 2011, Plaintiff Meyer was injured in Afghanistan when he was dismantling an Iranian-made and/or -supplied terrorism-related explosive device and it detonated while serving the U.S. Marine Corps.  Due to the impact of this attack, Plaintiff Meyer suffered severe personal injuries, including but not limited to amputation of his right hand above the wrist, amputation of his right leg above the knee, and amputation of fingers on his left hand.

62.     Plaintiff Jedidiah Morgan is a citizen of the United States and domiciled in the State of Oregon.  On or about June 20, 2012, Plaintiff Jedidiah Morgan was injured in Afghanistan when he was struck by an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Marine Corps.  As a result of this attack, Plaintiff Jedidiah Morgan suffered severe personal injuries, including but not limited to amputation of both legs above the knee, and loss of use of his right hand due to the severe damage to his muscles and nerves.

63.     Plaintiff Anna Morgan is a citizen of the United States and domiciled in the State of Oregon.  She is the wife of Plaintiff Jedidiah Morgan.  As a result of the attack and the injuries sustained by her husband, as described above, Plaintiff Anna Morgan has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

64.     Plaintiff Justin Patterson is a citizen of the United States and domiciled in the State of Colorado.  On or about October 16, 2004, Plaintiff Justin Patterson was injured in Iraq by a suicide bomb when he was conducting a raid while serving in the U.S. Army.  On or about June

2006, Plaintiff was again injured in Iraq when he was struck with an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Army.  On or about September 2007, Plaintiff was injured again in Iraq when his vehicle was hit by 1200 pounds of Iranian-made and/or -supplied terrorism-related explosives while serving in the U.S. Army.  Plaintiff spent the next three years in the hospital.  Due to the impact of these attacks, Plaintiff Justin Patterson suffered severe personal injuries, including but not limited to broken shoulder, shrapnel in his eye, broken right orbital, face and neck injuries from the shrapnel, and TBI.

65.     Plaintiff Elisa Patterson is a citizen of the United States and domiciled in the State of Colorado.  She is the wife of Plaintiff Justin Patterson.  As a result of the attack and the injuries her husband suffered, as described above, Plaintiff Elisa Patterson has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

66.     Plaintiff Alexis Patterson is a citizen of the United States and domiciled in the State of Colorado.  She is the daughter of Plaintiff Justin Patterson.  As a result of the attack and the injuries her father sustained, as described above, Plaintiff Alexis Patterson has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

67.     Plaintiffs A. P., E. P., and M. P., all minors represented by their legal guardian, Elisa Patterson, are citizens of the United States and are domiciled in the State of Colorado.  They are the children of Plaintiff Justin Patterson.  As a result of the attack and the injuries sustained by their father, as described above, Plaintiff A. P., E. P., and M. P. have experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

68.     Plaintiff Trevor Phillips is a citizen of the United States and domiciled in the State of Washington.  On or about May 11, 2004, Plaintiff was injured in Iraq when he was struck with an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Army.  Due to the impact of this attack, Plaintiff Trevor Phillips sustained severe personal injuries, including but not limited to loss of his right hand, shoulder injury, and loss of his hearing.

69.     Plaintiff T. W., a minor represented by her legal guardian, Trevor Phillips, is domiciled in the State of Washington.  She is the daughter of Plaintiff Trevor Phillips.  As result of the attack and injuries sustained by her father, as described above, Plaintiff T. W. has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

70.     Plaintiff Brandon Rumbaugh is a citizen of the United States and is domiciled in the State of Pennsylvania.  On or about November 29, 2010, Plaintiff Rumbaugh was injured in Afghanistan when he was rushing to aid another injured marine and stepped on an Iran- explosive Iranian-made and/or -supplied terrorism-related device while serving in the U.S. Marine Corps. As a result of this attack, Plaintiff Rumbaugh suffered severe personal injuries, including but not limited to amputation of his right leg at the hip, and amputation of his left leg at the knee.

71.     Plaintiff Joshua Sams is a citizen of the United States and is domiciled in the State of Ohio.  On or about January 12, 2012, Plaintiff Sams was injured in Afghanistan when he stepped on an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Marine Corps.  Due to the impact of this attack, Plaintiff Sams suffered severe personal injuries, including but not limited to loss of both legs above the knee, lose of two fingers, and other severe internal damages.

72.     Plaintiff Samuel Shockley is a citizen of the United States and domiciled in the State of Washington.  On or about March 17, 2013, Plaintiff was injured in Afghanistan when he was struck with an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Army.  Due to the impact of this attack, Plaintiff Shockley sustained severe personal injuries, including but not limited to amputation of both legs above the knee, loss of middle and index finger on his right hand, and skin graph of right arm.

73.     Plaintiff Miguel Simental is a citizen of the United States and domiciled in the State of Texas.  On or about June 24, 2004, Plaintiff Miguel Simental was injured in Iraq when his convoy was hit by an Iranian-made and/or -supplied terrorism-related explosive device while he was serving in the U.S. Marine Corps.  As a result of this attack, Plaintiff Miguel Simental suffered severe personal injuries, including but not limited to amputation of his leg.

74.     Plaintiff Ariadna Simental is a citizen of the United States and domiciled in the State of Texas.   She is the wife of Plaintiff Miguel Simental.  As a result of the attack and the injuries her husband suffered, as described above, Plaintiff Ariadna Simental has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

75.     Plaintiffs M. S., A. S., and M. A. S., all minors represented by their legal guardian, Ariadna Simental, and are citizens of the United States and domiciled in the State of Texas.  They are the children of Plaintiff Miguel Simental.  As a result of the attack and the injuries sustained by their father, as described above, Plaintiffs M. S., A. S., and M. A. S., have experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

76.     Plaintiff Daniel Stamper is a citizen of the United States and domiciled in the State of Washington.  On or about April 26, 2012, Plaintiff was injured in Afghanistan when he was struck with an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Army.  As a result of this attack, Plaintiff Stamper sustained severe personal injuries, including but not limited to TBI.

77.     Plaintiff John Steinbaugh is a citizen of the United States and domiciled in the State of Oregon.  On or about March of 2006, June of 2007, and May of 2010, Plaintiff was injured in Afghanistan and Iraq when he was hit by Iranian-made and/or -supplied terrorism-related explosive devices while serving as a medic in the U.S. Army.  Due to the attacks, Plaintiff Steinbaugh suffered severe personal injuries, including but not limited to head trauma/brain injuries, overpressure injuries, contusions, lacerations, and other severe injuries.

78.     Plaintiff Kyle Stewart is a citizen of the United States and domiciled in the State of Pennsylvania.  On or about October 18, 2010, Plaintiff was injured in Afghanistan when he was struck with an Iranian-made and/or -supplied terrorism-related explosive device while serving as a Medic in the U.S. Army.  Due to the impact of this attack, Plaintiff sustained severe personal injuries, including but not limited to loss of his lower left leg.

79.     Plaintiff Cameron Stuart is a citizen of the United States and domiciled in the State of Idaho.  On or about September 30, 2012, Plaintiff was injured in Afghanistan when he was struck with an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Army.  As a result of this attack, Plaintiff Cameron Stuart sustained severe personal injuries, including but not limited to severe damage to his left leg, which required several reconstructive surgeries.

80.     Plaintiff Katy Stuart is a citizen of the United States and domiciled in the State of Idaho.  She is the wife of Plaintiff Cameron Stuart.  As a result of the attack and the injuries sustained by her husband, as described above, Plaintiff Katy Stuart has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

81.     Plaintiff Matthew Sullivan is a citizen of the United States and domiciled in the State of California.  On or about August 25, 2010, Plaintiff Sullivan was injured in Afghanistan when he was struck with an Iranian-made and/or -supplied terrorism-related explosive device while serving the U.S. Army.  As a result of this attack, Plaintiff Sullivan suffered severe personal injuries, including but not limited to loss of his right leg below the knee, loss of his pinky finger, and diagnosed with TBI and PTSD.

82.     Plaintiff Carlos Torres is a citizen of the United State and domiciled in the State of California.  On or about July 3, 2011, Plaintiff Carlos Torres was injured in Afghanistan when he was hit by an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Marine Corps.  Due to the impact of this attack, Plaintiff suffered severe personal injuries, including but not limited to amputation of both legs, and fused left elbow.

83.     Plaintiff Julian Torres is a citizen of the United States and domiciled in the State of California.  On or about July 15, 2010, Plaintiff Julian Torres was injured in Afghanistan when he was hit by an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Marine Corps.  As a result of this attack, Plaintiff suffered severe personal injuries, including but not limited to amputation of his right leg above the knee, and amputation of his left leg below the knee.

84.     Plaintiff Ashley Torres is a citizen of the United States and domiciled in the State of California.  She is the wife of Plaintiff Julian Torres.  As a result of the attack and the injuries sustained by her husband, as described above, Plaintiff Ashley Torres has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

85.     Plaintiffs J. T., a minor, and A. T., a minor, both represented by their legal guardian, Ashley Torres, are citizens of the United States and domiciled in the State of California.  They are the children of Plaintiff Julian Torres.  As result of the attack and injuries sustained by their father, as described above, Plaintiffs J. T. and A. T. have experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

86.     Plaintiff Christopher Van Etten is a citizen of the United States and domiciled in the State of California.  On or about June 13, 2012, Plaintiff Van Etten was injured in Afghanistan when he was struck with an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Marine Corps.  Due to the impact of this attack, Plaintiff sustained severe personal injuries, including but not limited to amputation of both legs above the knee.

87.     Plaintiff Jesse Watson is a citizen of the United States and domiciled in the State of Missouri.  On or about December 5, 2011, Plaintiff Watson was injured in Afghanistan when he was struck with an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Army.  Due to the impact of this attack, Plaintiff sustained severe personal injuries, including but not limited to PTSD, Depressive Disorder, and TBI.

88.     Plaintiff Joshua Wells is a citizen of the United States and domiciled in the State of Mississippi.  On or about November 2, 2007, Plaintiff Joshua Wells was injured in Iraq when he was struck by four Iranian-made and/or -supplied terrorism-related explosive devices while

serving in the U.S. Army.  As a result of this attack, Plaintiff Wells sustained severe personal injuries, including but not limited to loss of both his legs from above the knees.

89.     Plaintiffs K. W., a minor, and T. W., a minor, both represented by their legal guardian, Joshua Wells, are citizens of the United States and domiciled in the State of Mississippi. They are the children of Plaintiff Joshua Wells.  As result of the attack and injuries sustained by their father, as described above, Plaintiffs K. W. and T. W. have experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

90.     Plaintiff Cameron West is a citizen of the United States and domiciled in the State of Georgia.  On or about October 15, 2010, Plaintiff Cameron West was injured in Afghanistan when he was struck by an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Marine Corps.  He instantly lost his right leg due to the impact.  As a result of this attack, Plaintiff Cameron West suffered severe personal injuries, including but not limited to amputation of his right leg, damage to his right arm, loss of use of his right hand, blindness in his right eye, and chest wounds.

91.     Plaintiff Madison West is a citizen of the United States and domiciled in the State of Georgia.  She is the wife of Plaintiff Cameron West.  As a result of the attack and the injuries sustained by her husband, as described above, Plaintiff Madison West has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

92.     Plaintiffs E. W., a minor, and R. W., a minor, both represented by their legal guardian, Madison West, are citizens of the United States and is domiciled in the State of Georgia. They are the children of Plaintiff Cameron West.  As a result of the attack and the injuries sustained

by their father, as described above, Plaintiff E. W. and R. W. have experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

93.    Plaintiff Brian Williams is a citizen of the United States and domiciled in the State of Texas.  On or about April 25, 2012, Plaintiff Brian Williams was injured in Afghanistan when he was struck with an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Military.  Due to the impact of this attack, Plaintiff Brian Williams sustained severe personal injuries, including but not limited to instant amputation of the left leg above the knee, fractured left arm, loss of teeth, ruptured eardrums, soft tissue damage throughout his body, and TBI.

94.    Plaintiff Jack Williams is a citizen of the United States and domiciled in the State of Kentucky.  On or about October 9, 2010, Plaintiff Jack Williams was injured in Afghanistan when he stepped on an Iranian-made and/or -supplied terrorism-related explosive device during an ambush while serving in the U.S. Army.  Due to the impact of this attack, Plaintiff Jack Williams sustained severe personal injuries, including but not limited to loss of both legs above the knee, loss of right arm above the elbow, collapsed lungs, hip replacement, pelvic fracture, and severe nerve damage to his only remaining limb.

95.    Plaintiff Ashlee Williams is a citizen of the United States and domiciled in the State of Kentucky.  She is the wife of Plaintiff Jack Williams.  As a result of the attack and the injuries sustained by her husband, as described above, Plaintiff Ashlee Williams has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

96.    Plaintiff K. W., a minor represented by her legal guardian, Ashlee Williams, is a citizen of the United States and is domiciled in the State of Kentucky.  She is the daughter of

Plaintiff Jack Williams.  As a result of the attack and the injuries sustained by her father, as described above, Plaintiff K. W. has experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

97.     Plaintiff Brett Wolf is a citizen of the United States and domiciled in the State of Texas.  On or about September 11, 2007, Plaintiff Wolf was injured in Iraq when he ran over an Iranian-made and/or -supplied terrorism-related explosive device on his return back to his base while serving for the U.S. Army.  As a result of this attack, Plaintiff Wolf sustained severe personal injuries, including but not limited to bilateral amputation of both legs above the knee with distal femur, complete paralysis of right ulnar nerve, broken elbow, which had to be fused at a 90 degree angle, TBI, multiple facial fractures, removal of his spleen, loss of hearing in his left ear, posttraumatic osteoarthritis, joint dysfunction with limitation of motion, migraines, various residual scars all over his body, bilateral left hip flexion contracture with left thigh retaining shrapnel, and bilateral right hip flexion contracture.

98.     Plaintiff Jack Zimmerman is a citizen of the United States and domiciled in the State of Minnesota.  On or about March 9, 2011, Plaintiff was injured in Afghanistan when he stepped on an Iranian-made and/or -supplied terrorism-related explosive device while serving in the U.S. Army.  As a result of this attack, Plaintiff Jack Zimmerman sustained severe personal injuries, including but not limited to the loss of both legs, loss of multiple fingers, amputation of thumb, dislocated collarbone, severe damage to right arm, and fracture of left arm.

99.     Plaintiff Megan Zimmerman is a citizen of the United States and domiciled in the State of Minnesota.  She is the wife of Plaintiff Jack Zimmerman.  As a result of the attack and the injuries sustained by her husband, as described above, Plaintiff Megan Zimmerman has

experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

100.    Plaintiffs B. Z., a minor, and W. Z., a minor, both represented by their legal guardian, Megan Zimmerman, are citizens of the United States and is domiciled in the State of Minnesota.  They are the sons of Plaintiff Jack Zimmerman.  As a result of the attack and the injuries sustained by their father, as described above, Plaintiff B. Z. and W. Z. have experienced loss of consortium, severe mental anguish, and extreme emotional pain and suffering, among other injuries.

## **DEFENDANT**

101.    During all relevant times, Defendant Iran is and was a foreign state within the meaning of 28 U.S.C. § 1603 and designated a State Sponsor of Terrorism pursuant to § 6(j) of the Export Administration Act of 1979.  *See* 50 U.S.C. App. § 2405(j).

102.    Defendant Iran provided material support and resources for the commission of acts of personal injuries, within the meaning of 28 U.S.C. § 1605A, including terrorist acts which Plaintiffs were killed or injured thereby.

103.    The Government of Iran is politically and ideologically hostile to the United States and its allies.  Particularly through its Islamic Revolutionary Guard Corps ("IRGC") and associated terrorist groups, Iran has consistently provided material support for acts of international terrorism, including attempted and actual extrajudicial killings, personal injuries, torture, hostage taking, aircraft sabotage, and others related acts.

104.    The IRCG is nominally comprised of five branches: Ground Forces, Air Force, Navy, Basij Militia, Qods Force Special Operations ("IRGC-QF"), in addition to a

counterintelligence directorate and representatives of the Iranian Supreme Leader.  Several IRGC

leaders have been sanctioned under the United Nations Security Council Resolution 1747.

105.    According to the U.S. State Department's 2005 Country Reports on Terrorism,

"[t]he IRGC was increasingly involved in supplying lethal assistance to Iraqi militant groups,

which destabilizes Iraq . . . Senior Iraqi officials have publicly expressed concern over the Iranian

interference in Iraq, and there were reports that Iran provided funding, safe passage, and arms to

insurgent elements."

106.    The IRGC-QF's "Department 2000" manages the flow of some of Iran's most

sophisticated weapon systems, including military grade EFPs, Improvised Explosive Devices

("IED"), anti-tank guided missiles, and various rockets like the Fajr-5, to linked terrorist factions

like Hezbollah and others.

107.    EFPs, IEDs and similar weapons were used to severely injure Plaintiffs.  The terms

EFP and IED are often used interchangeably.  Such weapons were professionally manufactured

and specifically designed by Iran and its agents to target U.S. and Coalition Forces' armor.

108.    In 2006, the British newspaper, *The Telegraph*, revealed that three Iranian factories

were "mass producing" the roadside EFP bombs used to kill soldiers in Iraq.  In October 2007, the

IRGC-QF was designated a Specially Designated Global Terrorist ("SDGT") pursuant to E.O.

13324 for its terrorism-related activities.  The U.S. Treasury Department's press release that

announced the designation, stated:

> The Qods Force has had a long history of supporting Hezbollah
> [sic]'s military, paramilitary, and terrorist activities, providing it
> with guidance, funding, weapons, intelligence, and logistical
> support.  The Qods Force operates training camps for Hezbollah
> [sic] in Lebanon's Bekaa Valley and has reportedly trained more
> than 3,000 Hezbollah [sic] fighters at IRGC training facilities in
> Iran.  The Qods Force provides roughly $100 to $200 million in

> funding a year to Hezbollah [sic] and has assisted Hezbollah [sic] in rearming in violation of UN Security Council Resolution 1701.
>
> In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.  (emphasis added).

109.   Like their clandestine operations in Iraq, the IRGC and IRGC-QF have provided weapons, explosives, roadside bombs, and other forms of support to elements of the Afghan Taliban in Afghanistan.  For example, C4 plastic explosives, mortars, and advanced armor-piercing explosives (EFPs and IEDs) from Iran have been routinely discovered in Afghanistan. And, U.S. and other NATO forces have intercepted numerous shipments of Iranian-made arms in Afghanistan.  The former U.S. Ambassador to Afghanistan, William Wood, stated in 2008 that "[t]here is no question that elements of the insurgency have received weapons from Iran." Furthermore, the Iranian-supplied EFPs especially, nicknamed "Dragons" in Afghanistan because of their catastrophic explosive force, have been credited by the Taliban as being responsible for successful attacks against U.S. and NATO forces.  Said one Taliban commander in 2008, "We're ambushing the Americans and planting roadside bombs [called 'Dragons' supplied by Iran].  We never let them relax."

## IV.   IRAN'S MATERIAL SUPPORT TO ACTS OF TERRORISM IN IRAQ AND AFGHANISTAN.

### A.   *Islamic Revolutionary Guard Corps – Qods Force Terrorism Efforts in Iraq*

110.   Prior to the U.S. invasion of Iraq in 2003, the IRGC- QF had long cultivated ties to Shi'a opposition groups opposed to Saddam Hussein's brutal regime, including the Badr Corps that was headquartered in Iran throughout the 1990's.

111.   During that time, the Badr Corps smuggled men and weapons into Iraq to conduct attacks against the Hussein regime.

112.   Before 2003, the Badr Corps served as Iran's most important surrogate inside Iraq, acting as a *de facto* arm of the IRGC-QF.

113.   The Badr Corps renamed itself the Badr Organization, after the Saddam Hussein's overthrow in 2003, and many of its operatives joined the newly formed Iraqi security forces.

114.   Published reports indicate that thousands of members of the Badr Organization remained on the IRGC-QF payroll after 2004.

115.   Several senior Badr Corps operatives later emerged as key conduits for funneling weapons to Iranian proxies in Iraq from 2004-2011, including Abu Mustafa al-Sheibani, a key smuggler of deadly Iranian IEDs and EFPs, and Jamal Ja'far Muhammad, a/k/a Abu Mahdi al-Muhandis (a.k.a. "The Engineer"), who later led Kata'ib Hezbollah.

116.   "Department 1000" of the IRGC-QF, known as the Ramezan Corps, was in charge of Iraq operations and remains the largest Qods Force command outside of Iran.  It coordinated, armed, and influenced Badr Organization.

117.   Although the Badr Organization evolved into a major political organization with seats in the new Iraqi parliament, it also played a significant role in facilitating Special Groups operations in Iraq.

118.   A segment of senior Special Groups commanders such as Al-Muhandis are, or were, initially Badr Corps personnel.

119.   President Bush declared on May 1, 2003, that "major combat operations in Iraq have ended."

120.   On May 23, 2003, the Coalition Provisional Authority established as the interim government for Iraq disbanded the Iraqi military forces.

121.    The U.N. Security Council authorized the post-conflict operation of Iraq by Coalition Forces in October 2003 to maintain "security stability."  S.C. Res. 1511, para. 13, U.N. Doc. S/RES/1511 (Oct. 16, 2003).

122.    Although U.S. Policy (supported by U.N. Security Council resolutions) was to establish peace and stability in Iraq in the hopes of establishing a democratic government, Iran viewed the U.S. peacekeeping efforts in Iraq as a potential threat to its regime.

123.    Rather than engage in armed conflict with the U.S. or other Coalition Forces, Iran chose to undermine U.S. peacekeeping efforts by supporting terrorism and sectarian violence in Iraq, particularly targeting U.S. servicemen and servicewomen and citizens.

124.    After 2003, the IRGC inserted hundreds of its Iranian-trained operatives into Iraq's state security organs (notably the Ministry of Interior intelligence structure) in part through its influence within the Badr Organization.

125.    Although a June 7, 2004 U.N. Security Council Resolution (S.C. Res. 1546, U.N. Doc. S/RES/1546) expressly assigned Coalition Forces in Iraq the task of helping Iraq "*by preventing and deterring terrorism*," Iran set out to target Coalition Forces and force them out of Iraq.

126.    In sum, from October 16, 2003 onward, even though U.S. military personnel in Iraq were participants in an internationally recognized peace keeping mission, Iran embarked on a policy of terrorism, murder, kidnapping and torture to thwart those efforts.

127.    Iran opposed U.S. peacekeeping efforts and initiated acts of international terrorism against American military personnel, Coalition Forces and U.S. citizens with the goals of destabilizing Iraq and increasing Iranian influence in that country.

128.   Iran, through its authorized agents and instrumentalities acting within the scope of their employment, agency and direction from Iran, provided material support and/or resources that facilitated acts of torture, attempted and actual extrajudicial killing, aircraft sabotage, and hostage taking that caused personal injury or death to more than one thousand Americans in Iraq.

129.   In particular, Iranian agents developed and cultivated Shi'a Special Groups, providing training in the use of EFPs, IEDs, Improvised Rocket Assisted Munitions, rocket-propelled grenades, sniper fire and mortars and operational and computer security.

130.   Jaysh al Mahdi (the "Mahdi Army" or "JAM") was established by radical Shi'a cleric Muqtada al-Sadr in June 2003.  Like the Badr Organization, it received support and training from the IRGC.

131.   On April 18, 2004 it led the first major armed confrontation against U.S.-led forces in Iraq from the Shi'a community.

132.   JAM expanded its territorial control of mixed or predominantly Shi'a neighborhoods and displaced or killed the local Sunni population. JAM was able to gain initial control in many of the neighborhoods surrounding Baghdad (including "Sadr City") by offering the Shi'a population protection and social services.

133.   Al-Sadr purportedly dissolved part of his militia after 2007, but he maintained a small group of Iranian-supported terrorists called the Promised Day Brigades to carry out attacks against Coalition Forces.

134.   The Promised Day Brigades received funding, training, and weapons from the IRGC.  Additionally, the Promised Day Brigades targeted U.S. forces in an attempt to disrupt security operations and further destabilize Iraq.  For example, on June 28, 2011 the Promised Day

Brigades issued a statement claiming responsibility for ten mortar and Katyusha rocket attacks against U.S. military convoys in which U.S. officials confirmed that three U.S. troops were killed.

135.    For many years, Kata'ib Hezbollah functioned as Iran's go-to terrorist group in Iraq and received support from Lebanese Hezbollah, including training in weapons use, IED and EFP construction and operation, and sniper rocket, and mortar attacks.

136.    Historically, Kata'ib Hezbollah operated mainly in Shi'a areas of Baghdad, like Sadr City and other areas throughout the southern region.

137.    On June 24, 2009, the United States designated Kata'ib Hezbollah a Foreign Terrorist Organization.

138.    The State Department's notice of Kata'ib Hezbollah's designation stated:

> The organization has been responsible for numerous violent terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks, and sniper operations. Kata'ib Hezbollah also targeted the International Zone in Baghdad in a November 29, 2008 rocket attack that killed two UN workers.  In addition, KH has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq.

139.    Kata'ib Hezbollah was also simultaneously designated a Specially Designated Global Terrorist because it was "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since 2007."

140.    The Treasury Department's press release announcing Kata'ib Hezbollah's designation explained that Kata'ib Hezbollah had "committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces."

141.    At that time, the press release also quoted Stuart Levy, under the Secretary for Terrorism and Financial Intelligence, as stating "the IRGC-Qods Force provides lethal support to

Kata'ib Hezbollah and other Iraqi Shia militia groups who target and kill Coalition and Iraqi Security Forces."

142.    The press release further reported that between March 2007 and June 2008, Kata'ib Hezbollah led a number of attacks against U.S. forces in Iraq, advising: "As of 2008, Kata'ib Hezbollah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hezbollah."  Additionally, in one instance, Hezbollah provided training to Kata'ib Hezbollah members in Iran, including building and planting IEDs, and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks.  Furthermore, the press release noted:

> Recordings made by Kata'ib Hezbollah for release to the public as propaganda videos further demonstrate that Kata'ib Hezbollah conducted attacks against Coalition Forces. In mid- August 2008, Coalition Forces seized four hard drives from a storage facility associated with a Kata'ib Hezbollah media facilitator. The four hard drives included approximately 1,200 videos showing Kata'ib Hezbollah's sophisticated planning and attack tactics, techniques, and procedures, and Kata'ib Hezbollah's use of the most lethal weapons--including RPG-29s, IRAMs, and EFPs--against Coalition Forces in Iraq.

> One of the hard drives contained 35 attack videos edited with the Kata'ib Hezbollah logo in the top right corner. Additionally, between February and September 2008, Al-Manar in Beirut, Lebanon, broadcast several videos showing Kata'ib Hezbollah conducting multiple attacks against Coalition Forces in Iraq.

> Immediately preceding the Government of Iraq's approval of the United States-Iraq security agreement in late November 2008, Kata'ib Hezbollah posted a statement that the group would continue fighting Coalition Forces and threatened to conduct attacks against the Government of Iraq if it signed the security agreement with the United States.

143.    In 2008, the U.S. Department of Defense stated that Kata'ib Hezbollah, "also known as Hezbollah Brigades, is a terrorist group believed to receive funding, training, logistics

and material support from Iran to attack Iraqi and coalition forces using what the military calls 'explosively formed penetrators' –roadside bombs designed to pierce armor-hulled vehicles—and other weapons such as rocket-assisted mortars."

144.   Kata'ib Hezbollah's leadership includes Abu Mahdi al-Muhandis (real name: Jamal al-Ibrahimi), a long-standing member of the Badr Organization who lived for many years in Iran.

145.   Al-Muhandis is wanted in Kuwait for his alleged role in the 1983 bombings of the American and French embassies in Kuwait City, as well as for his alleged involvement in the assassination attempt on the Kuwait Emir in 1985.

146.   Al-Muhandis was designated a Specially Designated Global Terrorist in July 2009 on the same day Kata'ib Hezbollah was designated.  The press release noted:

> As of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hezbollah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces. The groups received training in guerilla warfare, handling bombs and explosives, and employing weapons-to include missiles, mortars, and sniper rifles. In another instance as of September 2007, al-Muhandis led networks that moved ammunition and weapons--to include explosively formed penetrators (EFPs)-from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces. As of mid-February 2007, al-Muhandis also ran a weapon smuggling network that moved sniper rifles through the Iran-Iraq border to Shia militias that targeted Coalition Forces.
>
> Al-Muhandis also provided logistical support for attacks against Iraqi Security Forces and Coalition Forces conducted by JAM Special Groups and certain Shia militias. In one instance, in April 2008, al-Muhandis facilitated the entry of trucks--containing mortars, Katyusha rockets, EFPs, and other explosive devices--from Iran to Iraq that were then delivered to JAM Special Groups in Sadr City, Baghdad. Additionally, al-Muhandis organized numerous weapons shipments to supply JAM Special Groups who were fighting Iraqi Security Forces in the Basrah and Maysan provinces during late March-early April 2008.

In addition to facilitating weapons shipments to JAM Special Groups and certain Shia militias, al-Muhandis facilitated the movement and training of Iraq-based Shia militia members to prepare them to attack Coalition Forces. In one instance in November 2007, al-Muhandis sent JAM Special Groups members to Iran to undergo a training course in using sniper rifles. Upon completion of the training course, the JAM Special Groups members had planned to return to Iraq and carry out special operations against Coalition Forces. Additionally, in early March 2007, al-Muhandis sent certain Shia militia members to Iran for training in guerilla warfare, light arms, marksmanship, improvised explosive devices (IED) and anti-aircraft missiles to increase the combat ability of the militias to fight Coalition Forces.

In addition to the reasons for which he is being designated today, al-Muhandis participated in the bombing of Western embassies in Kuwait and the attempted assassination of the Emir of Kuwait in the early 1980s. Al-Muhandis was subsequently convicted in absentia by the Kuwaiti government for his role in the bombing and attempted assassination.

147.    General David Petraeus, who was the U.S. commander in Iraq in 2007, stated: Iran was "responsible for providing the weapons, training, the funding and in some cases the direction for operatives that have indeed killed U.S. soldiers" and "[t]here is no question about the connection between Iran and these components, [the] attacks have killed our soldiers." Moreover, in a July 2010 press briefing, U.S. General Ray Odierno described Kata'ib Hezbollah as "clearly connected to Iranian IRGC [Iranian Revolutionary Guard Corps.]"

148.    Lastly, Asa'ib Ahl al-Haq is a Shia Special Group supported by Hezbollah and the IRGC-QF that has conducted assassinations and operations against Iraqi civilians, Iraqi Security Forces and Coalition Forces.

149.    Asa'ib Ahl al-Haq was originally established by a follower of Muqtada al-Sadr named Qais al-Khazali.  Qais's brother, Laith Khazali, also helped lead the organization.

150.    Asa'ib Ahl al'Haq split from al-Sadr's Jaysh al Mahdi in 2006.  Since that time, Asa'ib Ahl al-Haq conducted thousands of IED attacks against U.S. and Iraqi forces, targeted

kidnappings of Westerners, launched rocket and mortar attacks on the U.S. Embassy, murdered American soldiers, and assassinated Iraqi officials.

151.    At all relevant times, Asa'ib Ahl al-Haq received significant funding, training, and arms from Iran, as well as closely coordinated with Iran's IRGC-QF and Hezbollah.

152.    Specifically, Lebanese Hezbollah operative Ali Musa Daqduq provided training to Asa'ib Ahl al-Haq terrorists.

153.    Hezbhollah and the IRGC-QF provided Jaysh al Mahdi, the Promised Day Brigades, Kata'ib Hezbhollah, Asa'ib Ahl al-Haq and other Shi'a groups with a variety of weapons used to target U.S. and other Shi'a groups with a variety of weapons used to target U.S. and Coalition Forces engaged in their post-2003 peacekeeping mission.

154.    These weapons included signature Iranian munitions such as EFPs and Improvised Rocket Assisted Munitions, as well as 107 mm rockets (often used as part of IRAMs), 120 mm and 60 mm mortars, RPG launcher and other small arms.

155.    Former U.S. ambassador to Iraq from 2010-2012, James Jeffery, said: "Up to a quarter of the American casualties and some of the more horrific incidents in which Americans were kidnapped . . . can be traced without a doubt to these Iranian groups."

**B.    *Iranian Terrorism Efforts in Afghanistan***

156.    Iranian terrorism efforts, often working through proxies using terrorist tactics, have also led to the deaths of or injuries to thousands of Americans in Iraq and Afghanistan, including Plaintiffs.  Just as it continues to do so in Iraq, Iran continues to provide arms and funding to anti-American coalition forces in Afghanistan.  As the U.S. government's Joint Improvised Explosive Device Defeat Organization ("JIEDDO") recognized in a 2006 report, "*Iran's intentions are the*

*same in both Iraq and Afghanistan*: to develop, fund and arm proxy networks to leverage against the perceived U.S. aim of pursuing an active regime change doctrine in Iran."  (Emphasis added.)

157.    The IRGC and IRGC-QF have provided weapons, explosives, roadside bombs, EFPs, IEDs, and other forms of support to elements of the Afghan Taliban for use against American and allied forces.  The Iranian-made advanced, armor-piercing EFPs/IEDs with a shaped charge, which were used with deadly effect by insurgents in Iraq, have also been discovered in large numbers in Afghanistan.

158.    In Afghanistan, the Iranian EFPs/IEDs have earned the nickname "Dragons" because they are shaped so that the explosive force is concentrated in the direction of the designated target rather than blasting in all directions and thereby weakening the impact.  Unlike ordinary mines that can cause minor damage to military vehicles, a Dragon "superbomb" can completely destroy a military Humvee or tank.

159.    The Afghan Taliban have credited Iranian-supplied weapons as being responsible for successful attacks against U.S. and NATO forces in Afghanistan.  According to one Taliban commander, the "Dragon[s]" are sent to Afghanistan by Iran.  They are "directional and . . . cause[] heavy casualties.  We're ambushing the Americans and planting roadside bombs.  We never let them relax.  If you lay an ordinary mine, it will only cause minor damage to Humvees or one of their big tanks.  But if you lay a[n] [Iranian] Dragon, it will destroy it completely."  Those who know the Afghan arms market well confirm that the Dragon mines come directly from Iran.

160.    In addition to devastating weapons injuring Americans through terrorist insurgency efforts, the IRGC and IRGC-QF have provided training to the Taliban insurgents to help them fight Western forces, according to U.S. counterterrorism officials.  By 2009, at least one U.S. counterterrorism official acknowledged that the degree of IRGC-QF assistance—i.e., supplying

arms and providing training to Taliban elements—had reached "very troubling" proportions, underscoring heightened concerns within the intelligence community.  Intelligence sources in Afghanistan have revealed that Iran has built camps in Afghanistan for terror activists.

161.    According to the U.S. State Department in its *Country Reports on Terrorism for 2009*:

> Iran's Qods Force provided training to the Taliban in Afghanistan on small unit tactics, small arms, explosives, and indirect fire weapons.  Since at least 2006, Iran has arranged arms shipment to select Taliban members, including small arms and associated ammunition, rocket-propelled grenades, mortar rounds, 107 mm rockets, and plastic explosives.

162.    Additionally, in 2007, the George W. Bush administration dubbed the IRGC a proliferator of weapons of mass destruction and imposed sanctions on the IRGC-QF.  It then accused the group of arming and training militants in Iraq who, in turn, attacked U.S. forces.  Thereafter, the U.S. and allied forces seized large caches of Iranian-made and -supplied weapons and explosives in Afghanistan, all bearing markings that they were sourced from Iran.  The weaponry included rockets, explosives, IEDs, and EFPs.  Plainly, Iran was employing in Afghanistan the same tactics that had successfully disrupted U.S. coalition peace-keeping efforts in Iraq.

163.    Furthermore, Iran directly paid Taliban insurgents to kill U.S. soldiers.  According to London's *Sunday Times*, Iran paid Taliban fighters $1,000 for each U.S. soldier murdered in Afghanistan and $6,000 for each destroyed American military vehicle.  One Taliban operative received $18,000 from Iran as a reward for an attack in 2010 than killed several Afghan government troops and destroyed an American armored vehicle.

164.    As the JIEDDO acknowledged in 2006, "Iran's introduction of EFPs in Iraq and Afghanistan has irritated U.S. military and political leaders enough that an Iranian escalation of

weapons is not necessary for Iran to supply an uncomfortable amount of pressure on the United States."  Iran's efforts in Afghanistan are prototypical.  "Iran historically fosters some form of relationship with all regional actors, including its own enemies, in pursuit of national interest.  This strategy is not simply meant to counter U.S. regional interests, but to actively extend Iranian influence and maintain strategic awareness of important actors at the state, sub-state, and non-state levels."

C.     ***Explosively Formed Penetrators (EFPs)/Improvised Explosive Devices (IEDs)***

165.    One of Iran's primary forms of material support and/or resources that facilitated attempted and actual extrajudicial killings and/or torture of U.S. service personnel and citizens in Iraq and Afghanistan was the financing, manufacturing, and deployment of EFPs and IEDs.

166.    As noted above, the EFPs deployed by the IRGC and IRGC-QF, though sometimes referred to as IEDs, were not truly "improvised" explosive devices but professionally manufactured and specifically designed to target the armor of U.S. and coalition forces.

167.     EFPs constitute "weapons of mass destruction" as that term is defined in 18 U.S.C. §2332a(2)(A).

168.    First used by Hezbollah against Israeli armor in Lebanon, EFPs are known as shaped charges, usually made with a manufactured concave copper disk and a high explosive packed behind the liner.

169.    In Iraq and Afghanistan, EFPs were often triggered by a passive infra-red device that set off the explosion within the casing, forcing the copper disk forward and turning it into a high velocity slug that could pierce most military-grade armor.

170.   To produce these weapons, copper sheets are often loaded onto a punch press to yield copper discs.  These discs are annealed in furnace to soften the copper and are then loaded into a large hydraulic press and formed into the disk-like final shape.

171.   EFPs are significantly more sophisticated than traditional homemade explosive devices as they are designed specifically to target vehicles such as armored patrols and supply convoys.

172.   Although Iran's use of EFPs was publicly disclosed by U.S. and British officials in 2005, the official identification of *specific* attacks as EFP attacks was not first publicly disclosed until 2010.

173.   In 2006, the U.S. State Department's Country Reports on Terrorism further documented Iran's specific efforts to provide terrorists with lethal EFPs to ambush and murder U.S. and other coalition forces:

> Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah [sic]. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hezbollah [sic], implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. *These individuals then passed on this training to additional militants in Iraq.* (emphasis added.)

174.   Additionally, in 2006 Brigadier Gen. Michael Barbero, Deputy Chief of Staff for Strategic Operations of the Multi-National Force – Iraq stated: "Iran is definitely a destabilizing force in Iraq.  I think it's irrefutable that Iran is responsible for training, funding and equipping some of these Shi'a extremist groups and also providing advanced IED technology to them, and there's clear evidence of that."

175.    Brigadier General Kevin Bergner commented on the Iran funding of Hezbollah operatives in Iraq:

> Actions against these Iraqi groups have allowed coalition intelligence officials to piece together the Iranian connection to terrorism in Iraq [...] Iran's Quds Force, a special branch of Iran's Revolutionary Guards, is training, funding and arming the Iraqi groups. [...] It shows how Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities. And it paints a picture of the level of effort in funding and arming extremist groups in Iraq.... The groups operate throughout Iraq. They planned and executed a string of bombings, kidnappings, sectarian murders and more against Iraqi citizens, Iraqi forces and coalition personnel. They receive arms -- including explosively formed penetrators, the most deadly form of improvised explosive device - and funding from Iran. They also have received planning help and orders from Iran.

176.    In May 2007, the Commander of the Multinational Division-Center, U.S. Army Major General Richard Lynch, commented that "[m]ost of our casualties have come from improvised explosive devices.  That's still the primary threat to our soldiers -- IEDs.  And we have an aggressive campaign to counter those IEDs, but they still are taking a toll on our soldiers: 13 killed, 39 soldiers wounded.  *What we're finding is that the technology and the financing and the training of the explosively formed penetrators are coming from Iran.*  The EFPs are killing our soldiers, and we can trace that back to Iran." (emphasis added.)

177.    According to the U.S. State Department's 2007 Country Reports on Terrorism:

> Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to some Iraqi militant groups that target Coalition and Iraqi security forces and Iraqi civilians. In this way, Iranian government forces have been responsible for attacks on Coalition forces. The Islamic Revolutionary Guard Corps (IRGC) Qods Force, continued to provide Iraqi militants with Iranian produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed

> projectiles (EFPs) that have a higher lethality rate than other types
> of improvised explosive devices (IEDs), and are specially
> designed to defeat armored vehicles used by Coalition Forces.
> The Qods Force, in concert with Lebanese Hezbollah, provided
> training outside Iraq for Iraqi militants in the construction  and
> use of sophisticated IED technology and other advanced
> weaponry. These individuals then passed on this training to
> additional militants inside Iraq, a "train- the-trainer" program. In
> addition, the Qods Force and Hezbollah have also provided
> training inside Iraq. In fact, Coalition Forces captured a Lebanese
> Hezbollah operative in Iraq in 2007.

178.    Other U.S. Government Reports, such as the Department of Defense's December

2007 "Measuring Stability and Security in Iraq" quarterly report to Congress, similarly concluded

that: "Iranian Islamic Revolutionary Guard Corps- Qods Force (IRGC-QF) efforts to train, equip,

and fund Shi'a extremists also continue despite reported assurances to Prime Minister Maliki that

Iran will cease lethal aid."

179.    The observations continued in 2008.  According to the U.S. State Department's

2008 Country Reports on Terrorism:

> The Qods Force, an elite branch of the Islamic Revolutionary
> Guard Corps (IRGC), is the regime's primary mechanism for
> cultivating and supporting terrorists abroad. The Qods Force
> provided aid in the form of weapons, training, and funding to
> HAMAS and other Palestinian terrorist groups, Lebanese
> Hezbollah, Iraq-based militants, and Taliban fighters in
> Afghanistan …
>
> Despite its pledge to support the stabilization of Iraq, Iranian
> authorities continued to provide lethal support, including
> weapons, training, funding, and guidance, to Iraqi militant groups
> that targeted Coalition and Iraqi forces and killed innocent Iraqi
> civilians. Iran's Qods Force continued to provide Iraqi militants
> with Iranian produced advanced rockets, sniper rifles, automatic
> weapons, and mortars that have killed Iraqi and Coalition Forces
> as well as civilians. Tehran was responsible for some of the
> lethality of antiCoalition attacks by providing militants with the
> capability to assemble improvised explosive devices (IEDs) with
> explosively formed projectiles (EFPs) that were specially

designed to defeat armored vehicles. The Qods Force, in concert with Lebanese Hezbollah, provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

D.    *Improvised Rocket Assisted Munitions (IRAMs)*

180.    Along with EFPs and IEDs, Improvised Rocket Assisted Munitions were a signature weapon of Shi'a militias in Iraq that were supplied by the Iranian Revolutionary Guard Corps.

181.    An IRAM is a rocket-fired improvised explosive device made from a large metal canister – such as a propane gas tank – filled with explosives, scrap metal and ball bearings and propelled by rockets, most commonly 107 mm rockets launched from fixed or mobile sites by remote control. They are designed to cause catastrophic damage and inflict mass casualties.

182.    According to JIEDDO of the U.S. Department of Defense, IRAMs were first introduced by Iran in November 2007 against U.S. personnel in Iraq.

183.    Although Iran's use of IRAMs was publicly disclosed by U.S. officials after their introduction in 2007, systematic identification of *specific* attacks as IRAM attacks were not publicly disclosed until 2010.

184.    IRAM attacks occurred primarily in Baghdad and in the Shi'a dominated areas of southern Iraq, where Iranian-backed militias primarily operate.

185.    All of the foregoing support from Iran and its agents for attacks on Coalition Forces and Iraqi civilians were financed and facilitated in substantial part by material support in the form of funds transfers initiated by Iran through Iranian banks on behalf of and for the benefit of Hezbollah and other agents of Iran's IRGC.

186.    By summer 2011, Iranian-built and supplied IRAMs were being used by Taliban fighters, giving those fighters roughly double the range to attack NATO and U.S. targets.  U.S.

officials said the rockets' markings and the location of their discovery gave them a "high degree" of confidence that they came from the IRGC-QF. U.S. officials have seen clear evidence that the IRGC has transferred IRAMs to elements of the Taliban that significantly enhance their ability to attack U.S. and NATO forces. Indeed, it is believed that the Taliban used an IRAM attack to kill 19 U.S. Navy SEALs and 19 other U.S. and coalition forces (38 persons total) aboard the twin-rotor CH-47 Chinook helicopter that the Taliban shot down in 2011.

## V.    CLAIMS FOR RELIEF

### PERSONAL INJURY UNDER 28 U.S.C. § 1605A(c) ON BEHALF OF PLAINTIFFS CAUSED BY TORTURE, EXTRAJUDICIAL KILLING, ATTEMPTED EXTRAJUDICIAL KILLING, OR THE PROVISION OF MATERIAL SUPPORT OR RESOURCES FOR SUCH AN ACT BY DEFENDANT

187.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

188.    Plaintiffs identified in the foregoing paragraphs were grievously injured by Defendant's acts of torture, extrajudicial killing, attempted extrajudicial killing, aircraft sabotage, or provision of material support for such acts (within the meaning of 28 U.S.C. § 1605A(h)(3)) to terror operatives in Iraq and Afghanistan, which ultimately injured Plaintiffs.

189.    As a direct and proximate result of the willful, wrongful, and intentional acts of Defendant and its agents, Plaintiffs were injured and endured severe physical injuries, extreme mental anguish, pain and suffering, loss of solatium, economic losses, and other injuries set forth in Section III herein.

190.    Plaintiffs' compensatory damages included, but are not limited to, their severe physical injuries, extreme mental anguish, pain and suffering, loss of solatium, and any economic losses determined by the trier of fact.

191.    The conduct of Defendant was criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award for punitive damages against Defendant pursuant to 28 U.S.C. § 1605A(c).

**PERSONAL INJURY UNDER 28 U.S.C. § 1605A(c) ON BEHALF OF THE FAMILIES OF PLAINTIFFS IDENTIFIED HEREIN AS INJURED AS A RESULT OF DEFENDANT'S TORTURE, EXTRAJUDICIAL KILLING, ATTEMPTED EXTRAJUDICIAL KILLING, OR THE PROVISION OF MATERIAL SUPPORT OR RESOURCES FOR SUCH AN ACT**

192.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

193.    Plaintiffs identified in the foregoing paragraphs were grievously injured by Defendant's acts of torture, extrajudicial killing, attempted extrajudicial killing, or provision of material support for such acts (within the meaning of 28 U.S.C. § 1605A(h)(3)) to terror operatives in Iraq and Afghanistan, which ultimately injured Plaintiffs.

194.    As a result of Defendant's acts, the families of the individuals identified in the foregoing paragraphs as injured due to Defendant's acts of torture, extrajudicial killing, attempted extrajudicial killing, aircraft sabotage, or provision of material support for such acts have suffered loss of consortium, severe emotional distress, extreme mental anguish, loss of sleep, loss of appetite, other severe physical manifestations, and other harms to be set forth to the trier of fact.

195.    Defendant's conduct was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages against defendant pursuant to 28 U.S.C. § 1605A(c).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand:

(a)     Judgment for all Plaintiffs against Defendant for compensatory damages, including but not limited to wrongful death and survival, physical injury, extreme mental and emotional anguish, pain and suffering, economic losses, loss of consortium, and loss of solatium, and other injuries set forth in Section III above and/or to be shown to the Court, in amounts to be determined at trial;

(b)     Judgment for all Plaintiffs against Defendant for punitive damages in an amount to be determined at trial;

(c)     Plaintiffs' costs and expenses;

(d)     Plaintiffs' attorneys' fees; and

(e)     Such other further relief as the Court finds just and equitable.

Dated: August 31, 2018                          Respectfully submitted,

                                                BAILEY PEAVY BAILEY COWAN
                                                HECKAMAN PLLC

                                                By:  /s/ Robert W. Cowan
                                                     Robert W. Cowan
                                                     DC Bar No. TX0148
                                                     Marathon Oil Tower
                                                     5555 San Felipe St., Suite 900
                                                     Houston, Texas 77056
                                                     Telephone: (713) 425-7100
                                                     Facsimile: (713) 425-7101
                                                     rcowan@bpblaw.com